argument in our second case, United States v. White. May it please the court, my name is Ruth Verne, I represent the appellate Michael White in this case. Co-counsel and I will address the two primary evidentiary issues raised during the trial in this case. I will address the admissibility of the remote and unrelated 404B evidence and the adequacy of the instructions given by the court. Co-counsel who represents Mr. Thomas will address the combination of opinion and fact testimony that was given by both expert and lay witnesses during the trial. One thing that I wish I had brought out better in the facts relating to the 404B evidence was the specific nature of the prior acts that were introduced with respect to both clients. With respect to Mr. Thomas, there were four prior acts introduced, two carrying a concealed weapon and the other two relating to distribution of cocaine. The ones relating to distribution of cocaine were when he was 18 years old, approximately 19 years prior. With respect to Mr. White, he was convicted nine years prior of the manufacture and distribution of a controlled substance, we don't know what that substance was. The court has said very clearly in the recent case of McBride that prior acts have to be relevant to the charge defense. The more closely related to the charge conduct and time pattern or state of mind, the more probative it is of the defendant's intent or knowledge. In McBride, the court was dealing with just an 18 month old conviction of possession with intent to distribute crack cocaine or to manufacture crack. And the court determined that the 18 months was such a significant passage of time that it attenuated any relevance. The court also stated that the government had failed to establish a connection between the prior acts and the charges in this case, in that case. In this particular case, there was no linkage offered or established by the government between those prior acts and the charges in this case, which were specifically conspiracy to distribute cocaine and crack cocaine. As the court stated in prior cases, intent in a general sense or in some senses always an issue in any charge. But as in Hernandez, none of the, neither of the two defendants in this case said that they didn't know what cocaine was or that they had no idea that they were dealing with someone who distributed cocaine. In this particular case, Mr. White said that he was, or at least the argument was, that he was a user and that the evidence did not establish that his contacts with this drug distributor, Mr. Moore, constituted conspiracy. Clearly, Mr. Thomas did not say that he did not know what cocaine was or that he had had no contact with cocaine or crack. Additionally, Mr. Thomas' convictions were dissimilar in other ways. His convictions were in New York. This conspiracy took place in Maryland. Mr. White was accused of distributing or conspiring to distribute cocaine and crack. His prior conviction was to manufacture. And again, we don't know whether that was to manufacture crack or produce marijuana or some other controlled substance that's completely unrelated to this. In cases where, which have been cited by the government. Is that part of the agreement that you all entered into, that you wouldn't name the prior drug? There was a stipulation that after the judge ruled. There is no indication in the record whatsoever. Nobody knew what it was? Is that what you're telling me? There's no indication in the record one way or the other as to why it was stated in that particular way. Clearly there was an objection. There was an objection to using it. And then there was a stipulation, the language in which both sides agreed. There was an agreement to the stipulation. But preserving your earlier objection. During the trial itself at the bench, the prosecutor pointed out to the court that during the motion to suppress the 404B evidence, or particularly the motion to eliminate, he had actually misstated the nature of the prior convictions, which he did clarify for the court during the trial at the bench. So certainly the inference would be that there was no specific agreement as to exactly how the stipulation was going to be given to the jury. And furthermore, as I looked at the. Well there was a stipulation as to how it was going to be given to the jury. But I don't believe that there was an agreement that it was going to be stated in that way. That is, that they knew, for example, that it was cocaine. But let's just say it was a controlled substance. My recollection is the record, although I'm not sure I can answer the court specifically at this moment. I can check and then respond to it in rebuttal. But my recollection is that the actual convictions in the record of conviction, particularly as reflected in the pre-sentence investigation report, were consistent with what the court told the jury. So that specifically the convictions themselves were unclear as to the nature of the controlled substance. In the cases referred to by the court, there was always a, excuse me, referred to by the government, there was always a clear link between the prior acts, especially if they were distant in time, and the charges. For example, in Rall, the similarity was he was charged with using empty trailers and fake bills of lading, and that's exactly what he had done in his prior acts. In Mark, the prior acts were in the same year, in the same state, and they were related with the same pattern of practice. Sale of drugs were to the same co-defendants. And importantly, he had testified, and other witnesses had testified, he had only innocent contact with these people. He had never bought or sold drugs. In Queen, also relied upon by the government. The witness tampering acts were nine years prior, but it was the exact same behavior, and he said he did not intend for his statements to the witness in this particular case to be taken as threats. He didn't know what he was doing. So those cases are very distinguishable from the ones in this case. Johnson is particularly helpful, Your Honor, because the prior acts were linked to a totally unrelated drug trafficking conspiracy that took place several years before the investigation that led to the indictment. So they were similar in that it was a conspiracy, but still there was nothing to directly link it to the charges in that particular case. As the court said, the fact that the defendant was involved in drug activity in the past does not provide a sufficient manner when it's not related in time, place, or manner of conduct. This only serves to establish, as the court said in McBride, character as a drug dealer. He gave a cautionary instruction to you along those lines. And the court has clearly emphasized the importance of instruction in 404B. But the court did say in Johnson that the instruction, first of all, does not cure a prejudicial or an improper admission to begin with. And secondly, in that case, the instruction simply wasn't adequate. I think it was called meager by the court, and it was very similar, strikingly similar, to the instruction given to the court in this case. And in particular, what was not present to my knowledge in Johnson, but was present in this case, is that the court made a point of saying a stipulation is one thing that's evidenced by the attorneys. And then, unfortunately, there was no qualifying instruction or no curative instruction or further explanation to the jury after they sent a note to the court saying, what do you mean we cannot hold this prior evidence against the defendant? What do you mean that we cannot use this evidence to determine whether or not he's a good or bad person? Unfortunately, the jury was left with that meager instruction given at the time, and the court's admonition that the attorneys can further advise the jury as to the way in which they could use that prior acts instruction. Regrettably, and probably because the attorneys understood, as the court had previously agreed that he was going to give, that the judge was going to give another instruction at the end of the case, they referred to that prior acts evidence in closing. The prosecutor... There's plenty of blame to go around. Defense counsel didn't bring it to the court's attention that he should re-instruct on that, did he? That's true, Your Honor, but in this particular case, it was clearly error in the context of having admitted it, but particularly because the jury had sent a note to the court saying, we may very well misuse this evidence because we don't understand how we can use it. No, Your Honor, the exact quote is... We are going to misuse this evidence, so please instruct us. The defense counsel may have made a decision not to ask for the second instruction. That may have been a tactical decision. Well, the defense counsel did try to address it in closing by saying, I'm sure that the prosecutor did not intend to imply anything other than that the evidence of prior convictions can only be used to show intent. In this particular case, though, in view of the court's representation to the jury... But no one followed up on that. How long was the trial? The trial, I believe, was approximately four days. Okay. So maybe the defense counsel forgot about it, and maybe the trial court did, too. That's possible, but ultimately... And it's defense counsel's obligation to stand up for the client, right? In the context of what happened here, though, we need to look at what really the prison through which the jury looked at the evidence, particularly against Mr. White... But it has to be plain error, though. That's correct, Your Honor. It has to be plain error, and it's reviewed for abuse of discretion. Yes, Your Honor. Thank you, Your Honor. Thank you. Good morning. My name is Gary Proctor, and I represent Mr. Thomas in this case. And as Ms. Vernay mentioned, I'm here primarily to address Issues 2 and 3 of the brief. And they're related and intertwined. And as I was reading through it last night, I guess Issue 2 is, I'm not here to dispute that someone can be qualified as an expert in drug trafficking and drug jargon and that sort of thing. The issues are rampant, and every court in the nation that's considered it says it's fine. So I'm not here to dispute that. I'm here to dispute that once qualified, the expert went so far afield of what he was qualified in, and that rises to the issue of plain error. Coupled with that, and also there were several other witnesses who weren't qualified at anything who also gave opinions. Coupled with that, the third argument is stated along the lines of the court didn't adopt adequate safeguards. Detective Underhill testified 14 times, three times on day one, seven times on day two, three times on day three, and once on the fourth and final day of trial, 14 times total. And if you read, and I'm sure the court will, his testimony, it weaves seamlessly between this is what I saw, and in my opinion, this means X, Y, and Z. Isn't that sufficient? If he said in my opinion this, that's his opinion, and this is what I saw as a fact. And again, Your Honor, I understand your question, but the court has to employ, and the onus is on the court, appropriate safeguards to explain to a jury this is opinion evidence, this is lay. You know, the Baptiste case, which is the case we rely upon, and I'm very familiar with it as I was Mr. Baptiste's counsel before this court, talks about four factors. And the most important factor is the government clearly demarcates what's opinion and what's fact. And here, there's none of that. There's none of that. You know, they play the call, what surveillance did you see? What does this mean to you? And, you know, if I may jump back to the witnesses that were never qualified as an expert in anything. Officer Wolf, it's usual and typical for drug dealers to frequent hotel rooms. I mean, that's an opinion. He was never qualified as anything. Sergeant Royster, the size of the scales are indicative of small quantities of cocaine being packaged up for sale. He searched, he found scales, that's what they mean to him. There's no qualification as an expert. Sergeant Royster, again, lactose is a common cutting agent. He's an officer, he observed something, he searched, and now he's opining as to how lactose may be used in the creation of crack cocaine. Sergeant Royster, again, he found some sandwich bags. What do those mean to you, officer? And this person was never qualified as an expert. Well, what drug dealers do is they take a little corner and they cut it out and they put their dime back in and they heat seal it. He's not qualified as an expert in anything. I mean, that is expert testimony. And even when we talk about Detective Underhill or Sergeant Underhill, who was qualified as an expert, he's testifying as to the pH and acidity and alkaline of cooking cocaine into crack cocaine. You know, what he was qualified by, Judge Bannadon, is... Now, all this is reviewed for plain error? And all of it, I submit, rises to the level of plain error. Yes, sir. Right. No one objected to any of this stuff at the trial? Correct. No one observed? Actually, the only person that objected... So the issues you're arguing were not preserved? The only person who objected to it was Judge Bennett, who sua sponte, called the parties up to the bench at one point, and said the exact testimony was along the lines of, I'll holler at you later, and Detective Underhill took that to mean, we will confect a drug agreement at some time in the near future. And Judge Bennett called him up and said, you know, he cited Baptiste, and said, you know, government, don't go there, don't do it anymore. And, you know, far from doing that, they continued on their merry way, and it never happened again. And Judge Bennett was also the trial court in Baptiste. And, you know, that's part of my... In Baptiste, this court said, it doesn't rise to the plain error because it's an issue of first impression. And, you know, Judge Bennett was that judge. He was the judge here. He plainly knew of the issue, as he brought them up once. But the other 13 times, Detective Underhill testified, and the other witnesses who testified were allowed to run rampant by issuing opinions without any basis for it, Your Honor. So for those reasons, you know, I don't think we're creating new law in this area. You know, it's pretty straightforward, and all we've got to do is... mousetrap the court and the government on appeal. Would you be creating new law with respect to plain error review? I don't think so, Judge. You know, when you look at Olano and those kind of cases... Believe me, we look at a lot of non-stop. I'm sure you do. You know, the factors in Olano are, you know, pretty straightforward. And, you know, the one that always trips people up is, does it rise to the level of undermining judicial confidence? And here, when you have all sorts of people, you know, Wolf, Royster, Marston, Penman, Underhill, all getting up and all opining and all these different things, and Underhill's the only one qualified as an expert, you know, I believe it does undermine the integrity of the process. They explained their backgrounds in these kind of investigations and things. They knew something about it. And if they were tendered as an expert, then... Well, maybe if defense counsels had objected to their testimony, they would have been tendered as experts. I am not quarreling that this was not defense counsel's finest hour, Your Honor, but that said, it's also incumbent upon the court to, you know, rein in... You're saying the court should have been the defense lawyer. Second chair. The court, on at least one occasion, realized it and called him up. It wasn't that it escaped his attention. It was that, you know, this continued to go on unabated, and no one said anything. So unless the court has any questions, I'll yield the remainder of my time. Thank you. Mr. Romano, what about this? Were you trial counsel? Yes, good morning, Your Honor. Chris Romano. I represent the appellee, and I was trial counsel. Well, you keep up with what the Fourth Circuit's doing, right? I try to. And you knew about this earlier decision. Are you referring to Baptiste? Yes, and I did. I was aware of that. Quite candidly, I felt that the way the case was presented, that while we didn't explicitly say each time Detective Underhill testified, ladies and gentlemen, this is the expert, this is the fact, but it was pretty clear from his testimony. For example, when we're going to play a call, and he's asked to interpret that call, it was then followed by surveillance agents who did the surveillance. I think it's pretty clear from the way he testified and the things that he testified about that you could delineate or demarcate what was expert testimony from what was fact testimony. Now, Baptiste suggests or says, well, you know, you might want to call him either at the very beginning and let him get all the fact testimony in, but these events transpired over a multiple-week time period, and in order for the jury to understand the case and have it presented, and counsel makes a big issue out of the fact that he testified 14 times, but there were calls that were intercepted throughout the call. What about the fact that he was never offered as an expert? Detective Underhill was offered as an expert. He was offered, but the others weren't. The others weren't, and let me address that, because the testimony that they gave was based on their personal participation in, for example, search warrants. You're saying it was fact testimony. I'm saying it was lay fact testimony, and it also went to explain why they seized the items that they did. It would make no sense for them, for example, to seize a scale with regard to the- But they gave a lot of opinions, though, didn't they? Well, they gave opinions based on the reason as to why they seized those items. The lay opinions they were given? Yes, sir, and actually there was cross-examination. For example, Detective Marston, and that was one of the names that was mentioned. Detective Marston testified about a search that he did at one of the locations. On cross-examination, not on direct, but on cross-examination, they asked Detective Marston, well, what about this dry erase board and all these numbers that are on here? Based on your training, knowledge, and experience, doesn't that suggest that it was a tally sheet? That came out of the defense. That didn't come out of the government. They made him an expert for their own purpose. Well, they certainly did, and the same thing was true with, for example, Detective Wolfe and with regard to Sergeant Royster. When they asked him about lactose, and they said, well, it has other uses. So when it was to their advantage, or at least what they perceived to be their advantage, they elicited testimony on cross-examination from these witnesses who, based on their training, knowledge, and experience, executed search warrants or participated in other aspects of the case and then were asked not just by the government, why did you seize this item, but they then solicited testimony, when I say they, defense counsel, with regard to other areas, for example, the dry erase board, the tally sheets, things of that nature. So to the extent that there was a crossover from lay testimony to expert testimony, the defense, both Mr. Popora and Mr. Saunders, who represent Mr. White, were the ones that elicited that kind of testimony. Indeed, Mr. Popora, for example, asked questions with regard to the drug codes where Detective Underhill was testifying about the search warrant that was executed at the motel room. On cross-examination, after Mr. Popora, on behalf of Mr. Thomas, had asked the Maryland state chemist if she knew what a Vic was, and she said she didn't. Then he's asking questions about Mr. Detective Underhill about, well, you know what a Vic is. That's Michael Vick's number. That's seven, seven grams. It wasn't as close to Joe Flacco, which was number five, which is our Baltimore Ravens, who we're going to see in a couple of days. The measurement showed that it was five grams as opposed to seven grams. These were questions that were elicited by the defense of Detective Underhill when he's on testifying about factual items. That is, I was at the Best Western Motel. I was there when items were seized. He was even asked questions on cross-examination about searches that he didn't even participate in. In light of all the evidence in this case, why did you need and why did you use the 404B? Well, the reason we used 404B was this. We used it to show knowledge and intent. I know that. I'm sorry, Your Honor. The defense in this case was, for example, Mr. White's defense was, I'm not a conspirator. I'm a mere addict. In fact, Mr. White's counsel even acknowledged that at the outset when we were arguing this that he had- Did Mr. White testify to that? No. His counsel presented that in his opening and through his cross-examination. Mr. White didn't testify? No, sir. He did not. Right. At the outset during the motions hearing- His lawyer was just saying you couldn't prove it. His lawyer was saying you couldn't prove your case. Correct. Well, that's legitimate for a defense lawyer to say. Well, but the elements here- Well, they all should say, I suspect. I suppose they should. Yes, Your Honor. Saying it and making it happen are two different things, though. Here, and under the Queen case, for example, when there's a lot of emphasis on the similarity or the dissimilarity of drugs, but in the Queen case, the similarity also goes towards the intent. Here, Mr. White's intent wasn't that he conspired. Mr. White's intent was, I'm a mere addict. I'm not anyone who's involved in conspiring with other people. Same thing with Mr. White. Mr. White didn't testify. He did not. But that was the defense that was put up. That was the defense that was argued by defense counsel when they were opening and throughout the trial. As far as Mr. Thomas, Mr. Thomas, in his opening, and, again, what was represented was, I may distribute drugs, but I'm not involved in a conspiracy. I am not a co-conspirator. And Judge Bennett found that the 404B was relevant to the issues of knowledge and intent. And, most respectfully, that is a decision. Did he also find it was necessary? He did, Your Honor. He found it was necessary. He found it was necessary because it dealt with those two items, that is, intent and knowledge. And he understood that, based on the defense that was being put out there, that intent and knowledge were elements that were in play in this case because of the conspiracy, and, therefore, they were relevant. It was necessary. How about one of them was 19 years old? Well, it was 19 years old. And one was 9 years old? That's correct. That sounds almost like a remote. Well, there's nothing in 404B that says that the age of a conviction is a disqualifier. And, indeed, the government cited cases that show even 20 years or 30-year offenses for 404B purposes are still there. It's still a rule of inclusion. It's not a rule of exclusion. And the similarity doesn't have to be the physical item. It can be the knowledge and intent. That's what Queen says. And let me correct a couple of points that counsel made with regard to 404B. First off – Now, the 404B issues are preserved. Do you agree with that? I agree that they're preserved, and the standard of review is an abuse of discretion. And here the court would have to find that Judge Bennett acted irrationally or arbitrarily in light of what was presented in terms of what the defenses were going to be and what the elements of the offense are. And I most respectfully submit that his decision, coupled with the limiting instruction, doesn't demonstrate that he was arbitrary or irrational when it came to admitting this. Well, let me understand. Neither defendant testified. Is that correct? That's correct. But in opening argument, they were allowed to talk about their clients' drug use, that they were just users and that kind of stuff. Is that correct? Yes, sir. Mr. Thomas's counsel actually said, my client's not guilty of conspiracy. He may have distributed drugs, but he's not guilty of conspiracy. That is, he didn't intend with one or more persons enter into an agreement to knowingly or involuntarily conspire to distribute drugs. Mr. White's counsel, in his opening, told the jury that his client was a popper, that he was a mere drug addict, that he had nothing to do with conspiracy, so that he had no knowledge, he had no intent to conspire with others. The other point is the convictions with regard to Mr. Thomas actually, the gun conviction. I thought he was arguing that that was all you all were going to be able to prove, was that he did those things. He wasn't representing that he knew the facts, or he wasn't making himself a witness or something in the opening statement, was he? The lawyers. The lawyers, no, they weren't making themselves witnesses. They were saying that. They were saying you couldn't prove that he was a big-time drug conspirator. He was a minor figure in the background of this stuff. Well, for Mr. White, he was. For both of them. For Mr. White, they were saying we couldn't prove that he was anything more than a drug addict. He was talking about the government wasn't going to be able to prove that he was anything more than a drug addict. Right, so that's precisely why it's necessary. Which makes him a minor player rather than a big-time player like you all had him charged as. Right, and that's why it's necessary and it's relevant because we needed to prove. So you can use this kind of evidence to rebut the opening statement of the defense lawyers, what you're saying. Well, I submit, yes, we can, because it's the government's burden to prove all the elements of the offense, and two of the elements of the offense are that they had knowledge. But the judge is telling them that what the lawyers say is not evidence. The evidence has got to come in from the witness stand, isn't it? That's correct. But we still have the burden. They don't have to do anything. The defense didn't put on any evidence about what you're saying, that this 404B was for the purposes of rebutting. It didn't rebut anything. It was part of your case in chief is the way you used it. I used it in my case in chief. They, through their cross-examination of the government's witnesses, attempted to show that Mr. White was nothing more than a drug addict and that Mr. Thomas was nothing involved in the conspiracy. Well, that was fair for him to do. I'm not saying it wasn't fair for him to do. I'm saying that's the way they decided to attack the elements of the offenses, and the government had the ability, or certainly based on what Judge Bennett perceived as necessary and relevant, in terms of the elements of the offense, the government was permitted to introduce through the stipulations that, and indeed the stipulations actually even said it was limited for purposes of knowledge and intent. And the offenses that we're talking about here were Maryland offenses. The firearms offense was the one that occurred in New York, and that's where we corrected it on the record. It had nothing to do with the drug offense. And actually if you look at the government's motion to admit it, with regard to the conviction of Mr. White, he received seven years on that offense, which is not a marijuana offense. It would have to be a cocaine. Was he part of the stipulation that he got seven years? That was not part of the stipulation. The stipulation was he'd been convicted of a controlled substance offense. That's correct. And you all knew what the controlled substance offense was. That's correct. Both counsel did, both defense counsel and the government did. That's correct. And what were they? With regard to Mr. White, it was powder cocaine. And one of the offenses, or the offense here, was to distribute or conspiring to distribute both powder and crack cocaine. And the stipulation, the lawyers decided in the stipulation to leave that out. That's correct, Your Honor. That was a conscious decision to leave it out. Just as was the stipulation itself, as opposed to the government actually presenting the evidence. It was, you know, with all due respect to the defense counsel, I believe it was a tactical decision on their part. Once they knew the evidence was coming in, to try to minimize what the impact of that evidence was. That's what I was getting at. I was trying to help you there. Thank you, Your Honor. I appreciate the help. And with regard to Mr. Thomas, the stipulation, which was government's Exhibit 54, actually indicates that it was in Frederick County, Maryland, not New York, and that it was a conspiracy to distribute cocaine. So those were the stipulations. As far as the instruction went, it was given at the time of, it was given at the time that the evidence was going to be introduced. When he read the stipulation, he gave an instruction. That's correct. We teed it up so that the court. And that was what, on the second day? I'm not sure, without checking the joint appendix, it was either the second or the third day of trial. But before we even introduced the stipulation, we let the court know and we let counsel know that it was going to come in, so that the court was prepared at that time to give the instruction, the limiting instruction. Was there any, there was no objection to the cautionary instruction, the content of it? There was not. The record is clear that there was not. But the judge told him, he also told all of you, that he was going to repeat that instruction in the court's charge. I don't believe he said that, Your Honor. And it may be in the record, but I don't recall that. What I do recall is after he gave his instructions, we were called up to the bench and the judge then asked all counsel, did I make any mistakes? Did I leave anything out? Is there something else that should have been provided in the instructions? And both defense counsels said no. So I don't recall that he. It's fair that no one asked him to give it again at that point, but I understood, I recalled that there was some indication he was going to do so. Your Honor may be correct. I don't recall that myself. It's talked about in their briefs, too. You don't recall any of this? I don't recall whether the court indicated that it was going to give the instruction a second time. If it's in their brief or if it's in the transcript, it may very well be. But nobody brought it to his attention at the charge, after the charge was given. We had a charging conference where we went through instruction by instruction. It wasn't done at that time. The court instructed after counsel argued. And at the conclusion of the instructions, counsel were called to the bench and asked if there were any additional instructions or if there were any mistakes. And again, both counsel for Mr. Thomas and Mr. White indicated that there were not.  I'll step aside from the podium. Thank you. Your Honors, with respect to the opinion testimony given by a lay witness in connection with Mr. White, that is that two men sitting in a car at a gas station or a seven 11, where you can't see anything of what they're doing constitutes a drug transaction. Although there wasn't an was not an initial objection by the Mr. White's counsel. Once the court objected to a sponte, Mr. White's counsel did request did move to strike the testimony and the court declined. So to some extent, I would ask the court to be aware of that, particularly because there was argument. And although Mr. My esteemed colleague did say that he disagreed with us regarding whether there was a delineation between fact and expert testimony that he thought the jury could tell the two apart. He did argue in closing that there had been testimony that there was a, that it was a drug transaction that had occurred in that parking lot. I do not believe that it was stated which particular occasion, whether it was the seven 11 or the, or the Exxon, but that was stated in closing. So I think that it's not clear that the jury could make a delineation and there was to some extent of preservation on that very issue. What the jury had asked in the note to the judge was what is meant by the stipulation for our knowledge and not to show good, bad person or history. This is on page 17 of the opening brief. The court did indicate, I will be instructing the jury on the law at the conclusion of the case. And some of those questions may be answered when I give you instructions on the law. The important thing with respect to Mr. White in particular is how thin the evidence was against him. How thin it was? Yes, sir. Because the strongest evidence against him was the opinion evidence, the opinion testimony given at, at those two gas stations. There was also opinion testimony by a lay person that when, and I believe, and I have to apologize because now I can't remember in the heat of the moment, but I thought that there was an objection. Again, that was at least entered by the court. When opinion evidence was given that when people go into a hotel room, that's routinely, routinely used for drug distribution. So the only, there was no evidence that Mr. White ever possessed any drugs. There was no testimony against him of any type with respect to the necessity of offering 404 B evidence against him because he said, I'm not guilty. Intent is always an issue to some extent in any offense, but that doesn't mean that the government can then dredge up distant and unrelated prior acts. On occasions when the prior acts which were allowed were distant, the court has been clear that those were substantially similar acts. But even when they were talking about an 18 month old conviction, as we had in McBride, the court, the government has to show a linkage. I do not recall the judge specifically finding that it was necessary in this case, or if he did, he didn't say why. What I do remember him saying is that he did not feel that this would be inflammatory. Regardless, there was no testimony, no indication that either defendant, particularly Mr. White, didn't know what cocaine was. What we did see is that he had no money, he had no property, he was never in possession of anything. The strongest evidence against him was that he was in a hotel room with a woman. What about the wiretap evidence? The wiretap evidence was minimal with respect to him. The only testimony with respect to him was that he had said, I'm trying to holler at you, which initially the detective said meant, oh, I want to meet up with you and have a drug transaction, but then on cross-examination he said, well, it could just mean I want to meet up with you, or it could mean I'm an addict and I need to use something. The subsequent calls, and I see I'm almost out of time, so I don't know if the court wants me to finish. The subsequent calls were all, I'm on road 10, or I'm on a particular route, where are we going to meet in this parking lot? So there was nothing really incriminating about the other calls that went along with that one. There was one subsequent, or excuse me, two subsequent calls that were intercepted where opinion testimony was given by Detective Underhill, but on cross-examination he equivocated. So there was very thin evidence against my client, and that's the prism through which the jury, which was, I submit to the court, confused by that prior evidence. That was the prism through which they viewed the evidence against him. Thank you very much. Thank you very much. We will come down and greet the lawyers and then go directly to our last case.
judges: Diana Gribbon Motz, Robert B. King, Henry F. Floyd